# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 29, 2016

## STATE OF TENNESSEE v. JERRICO LAMONT HAWTHORNE

**Appeal from the Criminal Court for Hamilton County**
**No. 281988     Rebecca J. Stern, Judge**

---

### No. E2015-01635-CCA-R3-CD – Filed September 7, 2016

---

The Defendant, Jerrico Lamont Hawthorne, was convicted by a Hamilton County Criminal Court jury of first degree premeditated murder, first degree felony murder during the perpetration of or attempt to perpetrate a robbery, attempt to commit first degree murder, a Class A felony, especially aggravated robbery, a Class A felony, and attempt to commit especially aggravated robbery, a Class B felony. *See* T.C.A. §§ 39-13-202 (2014), 39-13-403 (2014), 39-12-101 (2014). The trial court merged the felony murder conviction with the premeditated murder conviction and sentenced the Defendant to life imprisonment. The court also sentenced the Defendant to concurrent sentences of twenty-five years for attempted first degree murder, twenty-five years for especially aggravated robbery, and twelve years for attempted especially aggravated robbery. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by denying his motion to suppress the pretrial identifications, (3) the trial court erred by permitting evidence of cell phone data, (4) the trial court erred by permitting evidence pursuant to the dying declaration exception to the rule against hearsay, and (5) the trial court erred by failing to provide jury instructions on the lesser included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide. Although we affirm the Defendant's convictions for first degree premeditated and felony murder, attempted first degree murder, and especially aggravated robbery, we reverse the trial court's judgment for attempted especially aggravated robbery, vacate the conviction, and dismiss the charge because of insufficient evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Dismissed in Part**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Donna Miller (on appeal) and Amanda Dunn (at trial), Chattanooga, Tennessee, for the appellant, Jerrico Lamont Hawthorne.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; William H. Cox III, District Attorney General; and Lance Pope and Cameron Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On November 9, 2011, the Defendant and his codefendant, Deangelo Napoleon Justice, were indicted for premeditated and felony murder of James Williams, Jr., attempt to commit first degree murder of Yetta Harris, especially aggravated robbery of Mr. Williams, attempted especially aggravated robbery of Ms. Harris, attempted especially aggravated robbery of Jeffrey Dunnigan, aggravated assault of Mr. Dunnigan, and the reckless endangerment of C.H.[1] Before the trial, the charges related to Mr. Dunnigan and C.H. were dismissed, and the Defendant sought to suppress Ms. Harris's and Mr. Dunnigan's pretrial identifications.

## Motion to Suppress

Jeffrey Dunnigan testified that on July 27, 2011, he was living with his mother, Yetta Harris, and his younger brother, C.H. Mr. Dunnigan said that his mother and James Williams, Jr., had been in a romantic relationship for about eight years at the time of Mr. Williams's death. Mr. Dunnigan said that between 10:30 and 11:30 p.m., he left home to purchase a drink and that when he returned, the Defendant and the codefendant appeared from the side of the home and were holding guns. He said that the men approached him, that they pointed their guns at him, and that the Defendant told him to get inside the home. Mr. Dunnigan said that the men took him to a bedroom where his younger brother was located, that the men stomped, beat, and electrocuted him with a Taser, and that the men asked for his money. Mr. Dunnigan said that the Defendant left the room after Mr. Dunnigan told the Defendant where to find money and that the Defendant returned about three minutes later. Mr. Dunnigan said that the Defendant left the room again after hearing a car engine and that his parents walked inside the home through the front door. Mr. Dunnigan said that after a brief pause, he heard gunshots. He said that after the gunshots, the codefendant left the room and that Mr. Dunnigan heard additional gunshots. Mr. Dunnigan left the bedroom, walked to

---

[1] This court refers to minors by their initials.

the living room, and saw his mother and Mr. Williams had been shot. The Defendant and the codefendant were gone.

Mr. Dunnigan testified that he called 9-1-1, that the police and an ambulance arrived about twenty minutes later, and that he spoke with Detective Jay Montgomery and another detective later that night at the police station. Mr. Dunnigan said that the detectives provided him a photograph lineup and that he identified the Defendant as one of the men in his home. Mr. Dunnigan identified the photograph lineup he viewed at the police station, which was received as an exhibit.

Mr. Dunnigan testified that on August 10, 2011, the police provided him another photograph lineup and that he identified the codefendant. The photograph lineup was received as an exhibit. He noted that the police showed him several photograph lineups between his identifying the Defendant and the codefendant and that he did not identify anyone in those lineups. Mr. Dunnigan said that when he identified the codefendant, his mother was not in the room.

Mr. Dunnigan testified that before the night of the shooting, he had never seen the Defendant or the codefendant. He said that he was certain the Defendant and the codefendant were the men who were inside his home on the night of the shooting.

On cross-examination, Mr. Dunnigan testified that the photographs from the lineup were black and white and that the photograph lineup contained eight pages, each showing one photograph. He said the detectives provided him the pages in a stack. He did not recall viewing one page showing all eight photographs. He did not recall viewing forty photographs before identifying the Defendant. He said that he was instructed by the detectives to write his initials on the photograph he identified as the Defendant. Mr. Dunnigan did not recall if the police had a suspect at the time he identified the Defendant and said the police did not tell him they were looking for a particular person.

Mr. Dunnigan testified that he described the shooter as having a dark complexion and dreadlocks and that he provided a description of the shooter's clothes. He recalled the shooter wore a light gray shirt and black shoes with white laces. He said that although he heard both men speak during the incident, the police did not provide him a voice lineup. He said he and his mother did not speak about the men's identities while they waited for the ambulance to arrive but admitted he and his mother discussed the men later.

Mr. Dunnigan testified that the Defendant and the codefendant were behind him as they walked inside the home, that Mr. Dunnigan was pushed face first on the floor in the bedroom, and that the men stayed behind him while Mr. Dunnigan was on the floor. He said no porch lights were on when the men appeared from the side of the home but noted the street lights allowed him to see them.

Mr. Dunnigan acknowledged his preliminary hearing testimony in which he said he was electrocuted with a Taser about ten to fifteen times and testified that the codefendant said not to say anything after the incident. Mr. Dunnigan said that he sustained injuries from the Taser and that the injuries had healed. He said that his mother remained in the hospital for about three weeks and that he assisted his mother after her release.

Yetta Harris, Mr. Dunnigan's mother, testified that on the night of the shooting, she and Mr. Williams went to dinner and a nearby water park and that they arrived home after 10:00 p.m. She said that after Mr. Williams parked the car in the driveway, she opened the front door, walked inside, and saw the Defendant standing beside the door and pointing a gun at her head. She said the Defendant told her to "shut the f--- up" and "don't say anything." She said that the Defendant told her to get on the floor, that she complied, and that the Defendant closed the door. She said that after she lay on the floor, Mr. Williams opened the door and walked inside and that the Defendant said to Mr. Williams, "[Y]ou know what it is, n-----." Ms. Harris said that the Defendant searched Mr. Williams's pockets and that Mr. Williams did not attempt to hand anything to the Defendant. She said that the Defendant started shooting Mr. Williams multiple times and that Mr. Williams said, "Re[e]Re[e],[2] Jerrico man, why you doing this?" She said that Mr. Williams spoke loud enough to hear during the gunfire, that it sounded as though Mr. Williams were dying, and that Mr. Williams sounded scared.

Ms. Harris testified that after Mr. Williams fell from the gunshots, the codefendant walked in the living room to where the Defendant was standing and that she heard one of the men say, "[S]hoot that b----, too." She was unable to determine who made the statement because the men were standing behind her. She said that moments later, she was shot but did not see who shot her. She was shot twice in the stomach and once in the chest. She said the men left immediately after shooting her. She said that one of the men searched her purse but that nothing was taken. She said the men took the money inside Mr. Williams's pockets.

---

[2] The suppression hearing transcript reflects "ReRe," and the trial transcript reflects "ReeRee." We have chosen ReeRee for uniformity.

Ms. Harris testified that she was able to crawl onto her front porch, that a neighbor saw her, and that the neighbor called the police. She said she told the police before being placed in an ambulance that ReeRee was the person who shot them. She said that after she awoke in the hospital, she told the police that she would recognize the men if she saw them and provided a description of the men. She identified the photograph lineup from which she identified the Defendant and said she viewed the lineup while she was in the hospital. She said that after her release, she stayed at a friend's home and that the police came to the home to show Mr. Dunnigan a photograph lineup. She said that Mr. Dunnigan identified the codefendant from the lineup and that although she and Mr. Dunnigan were in the same room, she did not see the photographs before Mr. Dunnigan made his identification. She said that after Mr. Dunnigan made the identification, she asked if "he" was in the lineup, got up from the sofa, walked to view the lineup, and identified the codefendant as the second man inside her home. She said that she identified the codefendant based upon the man she saw standing inside her home on July 27, not who Mr. Dunnigan identified from the lineup. She said that the detectives did not ask her to view the lineup and that she only wanted to ensure the right person was identified.

On cross-examination, Ms. Harris testified that she did not notice anything unusual when she and Mr. Williams arrived home. She said that after Mr. Williams walked inside the home, Mr. Williams stood between her and the Defendant. She said that she saw Mr. Williams get shot, although she was lying on the floor and that she told the Defendant to stop shooting. She said a noise suppressor was not used during the shooting. She described the shooter to the police as a man with a light complexion and dreadlocks. She agreed she could not describe the perpetrators' clothes or other physical attributes. She said she was looking at the large, dark-colored gun. She agreed she told her neighbor the shooter was ReeRee and said it was possible Mr. Dunnigan heard her telling her neighbor ReeRee was the shooter. She agreed that when she spoke to the detectives after her surgery, she had been prescribed pain medication and did not recall the conversation.

Ms. Harris testified that she was heavily medicated when she identified the Defendant from the photograph lineup but that she recalled viewing at least five photographs before identifying the Defendant. She agreed she asked the detectives to tell her ReeRee's full name because although she recalled Mr. Williams saying ReeRee during the shooting, she could not recall the second name Mr. Williams used to refer to the shooter. She said that she knew she would know the name if she heard it again. She was certain she identified the correct person from the lineup because the image of the man's face remained in her mind.

Ms. Harris testified that the Defendant was the only person in the living room when she walked inside the home, that she and the Defendant made eye contact before she lay on

the floor, and that the Defendant looked as though he were "high on something." She said that when the codefendant entered the living room, she discreetly looked at the codefendant's face because she did not want the codefendant to know she was looking at him. She said she turned her head in order to look at the codefendant and denied she looked at the codefendant out of the corner of her eye. She conceded she testified at the preliminary hearing that she looked at the codefendant out of the corner of her eye. She said, though, she obtained a clear view of the codefendant, although she did not focus on his clothes. She agreed the Defendant or the codefendant could have said "shoot the b----."

Chattanooga Police Detective Jay Montgomery testified that he responded to the crime scene and that he spoke with Mr. Dunnigan after he arrived. Detective Montgomery said Mr. Dunnigan provided descriptions of two men who shot Mr. Williams and Ms. Harris. Mr. Dunnigan said the first man was dark-skinned, was African-American, had dreadlocks, and was in his mid-twenties. Mr. Dunnigan said the second man was light-skinned, was African-American, had short hair, and weighed more than the first man. Mr. Dunnigan reported the sequence of events to the detective and identified the dark-skinned man with dreadlocks as the shooter. Detective Montgomery said that when he arrived at the scene, an officer reported Ms. Harris had provided ReeRee as the shooter's name.

Detective Montgomery testified that he searched various police databases for ReeRee's identity and that he spoke to Vincent Kenneth, Mr. Williams's friend, who reported seeing Mr. Williams and ReeRee together about eleven days before the shooting. Mr. Kenneth thought ReeRee's surname was Hawthorne. Detective Montgomery said that he searched police photographs and found a photograph of the Defendant, who matched the description provided by Mr. Dunnigan. Detective Montgomery said he compiled a photograph lineup with the Defendant's photograph using the jail's mugshot system. He said the system generated photographs of people with characteristics similar to the Defendant's features. Detective Montgomery said the lineup he showed to Mr. Dunnigan was composed of color photographs.

Detective Montgomery testified that before showing the photograph lineup to Mr. Dunnigan, the detective instructed Mr. Dunnigan to look at the subjects' permanent features, noting hair could change over time. The detective told Mr. Dunnigan to focus on eyes, noses, and mouths, to make an identification if Mr. Dunnigan saw the person's photograph, and not to identify anyone if the person's photograph was not in the lineup. Detective Montgomery said that he provided Mr. Dunnigan a stack of photographs, not one page containing multiple photographs. Detective Montgomery said Mr. Dunnigan identified the Defendant.

Detective Montgomery testified that he and Investigator Pugliese first spoke with Ms. Harris a couple days after the shooting and that she was in the hospital's intensive care unit. He said that although Ms. Harris appeared to be in "bad shape," he provided Ms. Harris the same photograph lineup provided to Mr. Dunnigan. The detective said, though, that he moved the Defendant's photograph from the first to the last photograph. He said that he held the photographs for her, that she identified the Defendant's photograph, and that although she did not sign the photograph, the detectives audio recorded their discussion.

Detective Montgomery testified that the only information the police initially learned about the identity of the second man was from anonymous tips. Detective Montgomery said that when he received a tip identifying the man, he ran the name through various police databases. He said that if his search resulted in a photograph of a person matching the description of the second man, he placed the photograph in a lineup for Mr. Dunnigan to view. He said that Justin Hawthorne, the Defendant's brother, and Kamaari McCray, along with others, were excluded as suspects after Mr. Dunnigan viewed their photographs in photograph lineups and that multiple lineups were composed before Mr. Dunnigan identified the codefendant. Detective Montgomery said that these lineups were not shown to Ms. Harris because he did not believe she could identify the second man.

Detective Montgomery testified relative to the photograph lineup containing the codefendant's photograph that when Mr. Dunnigan made the identification, Ms. Harris was lying on the sofa. Detective Montgomery said Mr. Dunnigan spread out the photographs on a nearby table and identified the codefendant. Detective Montgomery said that although Ms. Harris was in the room when Mr. Dunnigan identified the codefendant, the detective did not ask Ms. Harris to attempt to identify anyone from the lineup. Detective Montgomery recalled, though, Ms. Harris asked to see the photographs and identified the codefendant as the person who said, "[S]hoot the b----."

On cross-examination, Detective Montgomery testified that his training relative to compiling a photograph lineup was based upon police department policy and that a lineup should contain photographs taken by the police or from the "Tennessee portal" and photographs of people with similar hairstyle, race, gender, height, weight, and tattoos. He said clothes were not a factor. He said that his previously described instructions to witnesses were to prevent a witness from being pressured to identify someone and to prevent any suggestiveness.

Detective Montgomery testified that he did not obtain descriptions of the men from Ms. Harris and that the photograph lineup he showed to Mr. Dunnigan and Ms. Harris was based upon the descriptions provided by Mr. Dunnigan on the night of the shooting. Relative

to Ms. Harris's identification of the Defendant, Detective Montgomery agreed that Ms. Harris said before identifying the Defendant that a man in another photograph "kind of look[ed] like him" and that Detective Montgomery told Ms. Harris there was one additional photograph to view. He agreed that Ms. Harris identified the Defendant and asked the detective for the Defendant's name and nickname and that the detective provided the names, confirming Ms. Harris's identification.

Detective Montgomery testified that his notes did not reflect information about the men's facial hair or tattoos and that Mr. Dunnigan and Ms. Harris did not mention tattoos. He agreed the Defendant had tattoos on both sides of his neck and that these tattoos would have been important to include in a description. Detective Montgomery said that he received information that Mr. McCray was involved in the shooting, that Mr. McCray was seen with the Defendant, and that Mr. McCray was dark-skinned, was African-American, and had dreadlocks. Detective Montgomery agreed that the men in the photograph lineup containing Mr. McCray's photograph also contained photographs of men with different lengths of dreadlocks and varying skin tones.

Detective Montgomery testified that he did not provide Ms. Harris general instructions about viewing the photograph lineup because he did not want to place additional stress upon her. He agreed that he had difficulty understanding Ms. Harris at times, that her medications affected her "regular functional capacity," and that she might have needed additional instructions.

Detective Montgomery testified that, based upon the information Ms. Harris provided, he did not believe Ms. Harris would have been able to identify the second man. Detective Montgomery agreed the only evidence tying the codefendant to the shooting was the photograph lineup identifications. Relative to Ms. Harris's identification of the codefendant, Detective Montgomery said it was possible Ms. Harris saw the photograph identified by Mr. Dunnigan based upon where Ms. Harris was lying on the sofa. The detective said Ms. Harris did not view all of the photographs but was drawn to the photograph she identified as the codefendant. Detective Montgomery said that Ms. Harris's identification was not how he would have normally conducted a photograph lineup.

**Trial**

Hamilton County 9-1-1 CAD Specialist Chris Gaynor testified that his office received a 9-1-1 call on July 27, 2011, at 11:41 p.m., related to a shooting at Ms. Harris's home. In the recording, which was played for the jury, Preston Matthews requested an ambulance and the police because two people had been shot. Mr. Matthews identified Ms. Harris's address

and said that he did not know how the victims had been shot, that the female victim had been shot, and that the male victim was inside the home. After asking the female victim about her injuries, Mr. Matthews told the dispatcher that the female victim had been shot twice. Mr. Matthews reported that the male victim had been shot in the chest and had intermittent consciousness.

Nellie Brown testified that she lived across the street from where the shooting occurred. She said that she and the victims were friendly but that the victims had not lived long in the neighborhood. Ms. Brown did not know the Defendant and had not seen him until the night of the shooting. She said that on the night of the shooting, she, her friends, and her cousins, including Mr. Matthews, were sitting outside her home. She said that about one hour before the shooting, she saw a white, older-model four-door car with "drive-out tags" drive up and down the street. She recalled the car drove by at least five times. She initially thought the young men inside the car were attempting to solicit a prostitute because the neighborhood was known for this activity. She said three to four people were inside the car.

Ms. Brown testified that after the white car drove up and down the street, she saw two African-American men walking down the street, that the first man had dreadlocks, that the second man had a "low haircut," and that both men were of medium build. She said that the men walked toward Mr. Williams's home and that thirty to forty-five minutes later she heard what she thought were seven to nine firecrackers. She said that about five minutes later, she saw the two men leaving Mr. Williams's home, that the men walked down the street nonchalantly, that a white car pulled up to the men, and that the driver of the car told the men to "jump in, jump in, go, go, go." She said that she wondered what had happened, that Mr. Matthews was walking in front of Mr. Williams's home after walking to a convenience store, and that Ms. Harris yelled from the front porch for Mr. Matthews's help. Ms. Brown ran to Mr. Williams's house to help Ms. Harris after Ms. Harris collapsed. Ms. Brown and Mr. Matthews called 9-1-1.

On cross-examination, Ms. Brown testified that her cousins and friends were drinking alcohol, that she was not drinking alcohol, and that she was waiting on Mr. Matthews to return from the convenience store with her cigarettes. She agreed she could not identify any of the occupants of the older-model white car. She said that although she saw the two men walk onto Mr. Williams's front porch and the screen door open, she did not pay attention and did not know if the men entered the home. She said she neither saw Mr. Dunnigan leave or return to the home nor any altercation on the front porch.

Ms. Brown testified that she did not recall telling the detectives at the scene that she could only describe the men as African-American who were wearing dark clothes. She said

that she saw the men walk toward Mr. Williams's home sometime after 10:00 p.m., that the men were inside the home for thirty to forty-five minutes, and that she did not see the men carrying weapons.

Chattanooga Police Officer Gary Frisbee testified that he and Officer Daves responded to the scene and that when he approached the home, he saw Ms. Harris lying on her stomach on the front porch. He saw a large amount of blood coming from her stomach and vomit near her head. He said he went inside the home and saw a young man holding Mr. Williams, who displayed no signs of life. Officer Frisbee saw blood, fired cartridge casings, and narcotics.

Officer Frisbee testified that Ms. Harris had labored breathing, was in significant pain, and asked him to help her. He said that he attempted to calm her by assuring her paramedics were en route. He said that he asked her if she knew who shot her and that Ms. Harris identified ReeRee as the shooter.

On cross-examination, Officer Frisbee testified that he saw multiple plastic bags containing crack cocaine in the living room. He said he searched the scene and the surrounding area for a weapon but did not find one. He said that although Ms. Harris told him ReeRee shot her, she did not provide the name Jerrico or a description of the person who shot her. He did not recall any neighbors being on Ms. Harris's porch when he arrived at the scene. On redirect examination, Officer Frisbee stated that he did not find any money lying on the floor and that he had no additional contact with Ms. Harris after paramedics took her to the hospital.

Chattanooga Police Sergeant Heather Williams testified that she and Investigator Salyers processed the scene. She collected blood evidence on the interior and exterior of the front door, the front door frame and handles, the front porch, and living room floor. She took photographs inside the home, which showed, in part, the open drawers of a bedroom nightstand. Sergeant Williams said that the bedroom appeared to have been ransacked and noted that the mattress had been moved. She said that one of the drawers had a bullet hole with a projectile lodged in it. She obtained DNA samples from the nightstand. She identified multiple cartridge casings, multiple projectiles, and a plastic bag with suspected crack cocaine from the living room area. She did not find any money inside the home. She said a "doo-rag" cloth was found in the roadway up the street from the home. She said that although fingerprints were obtained inside the house, none of the fingerprints were identified as belonging to any particular person. She said the medical examiner provided her five projectiles recovered during Mr. Williams's autopsy.

Sergeant Williams testified that she collected a cell phone from the living room, which was later identified as Mr. Williams's phone, and that it was later released by the investigating detectives. She said then-Sergeant Whitfield gave her another cell phone. She submitted both phones to the property room.

Chattanooga Police Officer Kenneth Burnette, Jr., testified that he responded to the hospital at Sergeant Williams's request to recover the victims' clothes. He said that when he arrived, Mr. Williams had died and that Ms. Harris was in the operating room. Officer Burnette said that he took photographs of Mr. Williams's injuries and that Mr. Williams had bullet wounds on his lower right chest, upper left chest, lower left pelvis, left hip, and back. Officer Burnette said he collected the victims' clothes, left the hospital, and later returned to recover two projectiles removed during Ms. Harris's surgery. Officer Burnette said a gunshot residue test was performed on Mr. Williams at the hospital.

Tennessee Bureau of Investigation (TBI) Special Agent Terri Arney, an expert in firearms analysis, testified that she examined cartridge casings and projectiles to determine if the casings and projectiles were fired from the same firearm. She said that eight cartridge casings were submitted for analysis, that they were .32-caliber ammunition, and that they were fired from the same firearm. She said that seven projectiles were submitted for analysis and that the projectiles were fired from a .32-caliber semiautomatic pistol. Relative to the projectiles removed during Mr. Williams's autopsy, she said they were .22-caliber and that based upon the markings, they were most consistent with being fired from a revolver. Relative to one of the projectiles removed from Ms. Harris, Agent Arney said it was a lead .38-caliber or .357-caliber bullet. She did not receive .22-caliber cartridge casings for analysis.

On cross-examination, Agent Arney testified that two projectiles were recovered from the living room, one from the hallway, two from Ms. Harris's body, and five from Mr. Williams's body. Relative to the projectiles recovered from Mr. Williams, Agent Arney stated that three were .32-caliber and that two were .22-caliber. She concluded that the projectiles came from two firearms. She said that her report showed the .22-caliber projectiles were recovered from Mr. Williams's sacrum and left thigh. Relative to the projectile lodged in the nightstand, she said she could not determine when the shot was fired.

The parties stipulated to the results of the DNA analyses. Ms. Harris's DNA was found on the front porch, on the carpet inside the home, and on the plastic bag containing a rock-like substance. The front door contained a mixture of genetic material. The major DNA contributor was Ms. Harris, and the minor contributor was from at least one unknown person. The Defendant, the codefendant, Mr. Williams, and Mr. Dunnigan were excluded as

contributors. A mixture of genetic material was found on the nightstand drawer, and the Defendant, the codefendant, and Mr. Dunnigan were excluded as contributors. Further analyses were inconclusive because of an insufficient or a degraded sample. A mixture of genetic material was found on the front storm door, and the Defendant, the codefendant, and Mr. Williams were excluded as contributors. Further analyses were inconclusive because of an insufficient or a degraded sample. No DNA was found on the doo-rag.

The parties stipulated to the results of the gunshot residue analyses. Relative to Mr. Williams and Mr. Dunnigan, the analyses showed the absence of elements indicative of gunshot residue. The report stated that the analyses could not eliminate the possibility Mr. Williams and Mr. Dunnigan fired, handled, or were near a gun when it fired. Ms. Harris's pants and belt did not reveal the presence of gunshot residue. The report noted that a negative result could also occur when gunshot residue is lost because of washing, excess time between firearm discharge and evidence collection, and other routine activities.

The parties stipulated to the forensic chemistry report of the rock-like substance found inside the home. The substance contained cocaine and weighed 1.41 grams.

Richard Bremer testified that he was employed by Superior Creek Lodge and that he performed various tasks, including maintaining the motel's surveillance cameras. He said that the property was gated and that the entrance gate contained a surveillance camera and a card swipe machine used by guests to enter the property. He identified a video recording from the entrance gate camera on July 27, 2011, portions of which were played for the jury. The recording showed that at 9:36 a.m., a four-door white car, driven by an African-American man, stopped at the gate and entered the property after the gate opened. A person was sitting in the front passenger seat but was unidentifiable. The recording showed that the same car entered the gate at 5:46 p.m. and that the car was driven by an African-American woman with no visible passengers.

On cross-examination, Mr. Bremer testified that entry to the property could be gained by entering a room number on the keypad at the entrance gate and that the guest inside the room could open the gate. He said that the portions of the recording played for the jury were selected based upon a particular room number.

Jeffrey Dunnigan testified that at the time of the shooting, he lived with his mother, his younger brother, his older sister, and Mr. Williams. He said that on the night of the shooting, he was babysitting his brother while Ms. Harris and Mr. Williams went to dinner. Mr. Dunnigan said that he left his brother at home, walked to the car wash to purchase a drink, and walked home. He said that when he was walking home, he saw two men walking

up the street toward his home. He said that when he reached the front porch, he was approached by two men. He provided testimony consistent with his suppression hearing testimony regarding the events before and after the shooting.

Mr. Dunnigan testified that the Defendant was holding a semi-automatic firearm and that the codefendant was holding a revolver when the Defendant and the codefendant came from the side of the home. Mr. Dunnigan said that after the men forced him inside the home, they walked him to a bedroom at the rear of the home and that the Defendant forced him on the floor. Mr. Dunnigan said one of the men forced his brother on the floor but could not recall which man.

Mr. Dunnigan said that he thought he used Mr. Williams's cell phone to call 9-1-1. He provided testimony similar to his suppression hearing testimony about his identifying the Defendant in a photograph lineup. He recalled that the Defendant's photograph was first in the lineup and that he identified the Defendant at 4:00 a.m. after the shooting.

On cross-examination, Mr. Dunnigan testified that seconds elapsed between the Defendant's and the codefendant's appearing from the side of the home and their forcing him inside the home. He said the bedroom lights were off but that the television was on after the Defendant forced him on the floor. He said he was stomped in the head and electrocuted by a Taser multiple times. He said that he saw the Defendant's face when they were on the porch and when the Defendant assaulted him in the bedroom.

Mr. Dunnigan testified that his mother did not tell him ReeRee shot her and Mr. Williams while they were waiting for the police and an ambulance. He agreed, though, the police asked him if he knew someone named ReeRee. Mr. Dunnigan provided testimony similar with his suppression hearing testimony regarding his description of the intruders to the detectives. He said that the revolver was chrome, that the other gun had a magazine, that he thought the gun with a magazine was a .38-caliber, and that he provided this information to the police.

Mr. Dunnigan testified that he did not recall the news media showing the Defendant's photograph on television but that he recalled the Defendant's photograph being in the *Just Busted* pamphlet. Mr. Dunnigan agreed that he and his mother had discussed the shooting and his mother's belief about who was responsible and that he was confident the Defendant was the person who shot his mother and Mr. Williams.

On redirect examination, Mr. Dunnigan testified that the home had one porch light and that the crime scene photographs showed the porch light was on. He said that the street lights were on when the Defendant and the codefendant approached him on the porch and that the lighting allowed Mr. Dunnigan to see the Defendant and the codefendant when they approached. He said that although the men turned off the bedroom light, the bathroom light remained on during the incident. He also said the 46-inch television in the bedroom remained on during the incident. He said he was positive the Defendant was the person who entered his home, shot his mother, and shot Mr. Williams.

On recross-examination, Mr. Dunnigan testified that the crime scene photographs showed the bedroom light was on and agreed that the photographs might not reflect the lighting at the time of the incident. He agreed his preliminary hearing testimony reflected that no porch lights were on outside the home.

Yetta Harris testified that she and Mr. Williams had been in a romantic relationship for about five or six years at the time of the shooting. She said Mr. Williams played poker and sold crack cocaine to earn money. She said that although someone might think Mr. Williams had a lot of money, Mr. Williams only earned enough money to pay bills and to provide for their basic needs.

Ms. Harris testified that on the night of the shooting, she and Mr. Williams had been away from home and that when they returned, she left Mr. Williams in the car and walked inside their home. She said that Mr. Williams stayed behind to gather some belongings and that when she walked inside the home, the Defendant was standing behind the front door and was holding a gun. She recalled the porch light was off when she and Mr. Williams arrived home. She said, though, that the Defendant was standing two feet from her when she saw him, that the end table lamp was on in the living room, and that the overhead ceiling light was on in the living room. Ms. Harris provided testimony consistent with her suppression hearing testimony regarding the events after she entered the home, the description of the Defendant's gun, Mr. Williams's entering the home, the Defendant's searching Mr. Williams's pockets, the Defendant's statements, and the Defendant's shooting Mr. Williams.

Ms. Harris testified that she understood the Defendant's saying, "[Y]ou know what this is," meant he was robbing her and Mr. Williams. She said that Mr. Williams had about $200 that night and that the Defendant took it when he searched Mr. Williams's pockets. Ms. Harris said that the Defendant began shooting after taking the money. She provided testimony similar to her suppression hearing testimony regarding Mr. Williams's referring to the Defendant as ReeRee and Jerrico during the shooting, the codefendant's entering the living room after the shooting, and her hearing one of the men say, "[S]hoot that b----, too,"

-14-

before being shot three times. She did not know whether the Defendant or the codefendant shot her.

Ms. Harris testified that she attempted to use Mr. Williams's cell phone to call 9-1-1 but that she could not operate the phone. She provided testimony similar to her suppression hearing testimony regarding Mr. Dunnigan's entering the living room and attempting to provide assistance, her crawling to the porch and summoning help from a neighbor, and her telling someone that ReeRee shot them. She could not recall whom she told but said the person might have been wearing khaki pants. She provided testimony similar to her suppression hearing testimony regarding her identifying the Defendant in a photograph lineup.

Ms. Harris testified that she did not know Laquela Bailey before the shooting, although she had seen Ms. Bailey in the neighborhood. Ms. Harris said Mr. Williams and Ms. Bailey knew each other. Ms. Harris said that before the day of the shooting, she had seen Ms. Bailey driving on Ms. Harris and Mr. Williams's street and had seen Ms. Bailey following them on July 4.

On cross-examination, Ms. Harris testified that although she was lying on the floor when Mr. Williams entered the home, she was able to watch the Defendant's interaction with Mr. Williams. She acknowledged her preliminary hearing testimony in which she said she lay face down after Mr. Williams entered the home. She agreed she only told the police that the shooter was a dark-skinned African-American man with dreadlocks and said she knew the shooter was taller than her and was not overweight. She said that the police only asked her if she knew the shooter and that she told them the name provided by Mr. Williams during the incident. She did not know whether the Defendant had tattoos on his arms and neck and whether the tips of the Defendant's hair were dyed orange. She said, though, she saw the Defendant's face and would never forget it.

Ms. Harris testified that as Mr. Williams fell backward after being shot, Mr. Williams asked why Jerrico was doing this and that Mr. Williams did not scream. She said she heard Mr. Williams over the continued gunshots. She agreed she told the police the name ReeRee and said she had forgotten the name Jerrico when she talked to the police at the scene and at the hospital but was certain she would know the name if she heard it again. She did not recall asking the investigators for the Defendant's name after she identified the Defendant's photograph from the lineup. Although she agreed she had provided conflicting testimony regarding the procedures used when she identified the Defendant in the lineup, she recalled viewing photographs before identifying the Defendant. On redirect examination, she stated that although she had provided inconsistent testimony about when and to whom she spoke

-15-

and about the procedures used during the photograph lineup, she had never wavered in her identification of the Defendant as the shooter.

Chattanooga Police Detective Jay Montgomery testified that when he arrived at the scene, patrol officers provided him the nickname ReeRee as that of a possible suspect. Detective Montgomery said that based upon a joint investigation with the street-level crime and suppression unit at the scene, he linked the Defendant to the nickname ReeRee. Detective Montgomery provided testimony similar to his suppression hearing testimony regarding his discussion with Mr. Dunnigan at the scene, his preparing a photograph lineup, his instructions to Mr. Dunnigan relative to the lineup, and Mr. Dunnigan's identifying the Defendant from the lineup.

Detective Montgomery testified that after Mr. Dunnigan identified the Defendant from the photograph lineup, the detective contacted the police department's fugitive division to locate the Defendant. Detective Montgomery said that the fugitive division learned Ms. Bailey was an associate of the Defendant's and that the day after the shooting, Ms. Bailey came to the police station to talk to Detective Montgomery. He said that on July 30, the fugitive division and the United States Marshals Service learned the Defendant might have been staying at a motel, that upon examining the guest registry, Detective Montgomery learned Kimberly Roach, an associate of Ms. Bailey, was a registered guest at the motel, and that Ms. Bailey's car was in the motel's parking lot. He identified a photograph of Ms. Bailey's car, a black Nissan Maxima, with large garbage bags inside the passenger compartment. Detective Montgomery said that the Defendant and Ms. Bailey were found inside Ms. Roach's motel room.

Detective Montgomery testified that Ms. Bailey's cell phone was seized and that information was obtained from the phone. He said that based upon his review of the telephone numbers contained in the call log history, he obtained call log information from Kamaari McCray's cell phone. Detective Montgomery also obtained call log information from two additional phone numbers associated with Ms. Bailey's call log. The records were received as exhibits.

On cross-examination, Detective Montgomery testified that after he arrived at the scene, he spoke to an officer about Ms. Harris's identifying a potential suspect. Detective Montgomery agreed that he did not speak to Ms. Harris and that she had been taken to the hospital when he arrived. Detective Montgomery said that Officer Francis told him Ms. Harris had identified the shooter as an African-American man whose nickname was ReeRee. Detective Montgomery denied that the officer provided him the names Jerrico or ReeRee Jerrico. Detective Montgomery agreed that everyone at the scene talked about ReeRee.

Detective Montgomery testified that he spoke with Mr. Dunnigan around 1:40 a.m., when Mr. Dunnigan was in a police cruiser and that Mr. Dunnigan told Detective Montgomery he had been punched, kicked, and electrocuted with a Taser. Detective Montgomery stated that Mr. Dunnigan did not receive medical attention at the scene and that Detective Montgomery did not notice visible injuries. Detective Montgomery said that Mr. Dunnigan described a dark-skinned, African-American man with dreadlocks who had a smaller frame than the second suspect. Detective Montgomery did not remember whether he asked Mr. Dunnigan about the dark-skinned man's facial hair, tattoos, or hair color. Detective Montgomery agreed that the Defendant had several tattoos. Detective Montgomery identified photographs of the Defendant's tattoos, which showed numerous tattoos on the Defendant's neck, hands, shoulders, and forearms.

Detective Montgomery testified that if the Defendant's tattoos were visible, they were a distinguishing feature. He said that at the time of the Defendant's arrest, the tips of the Defendant's dreadlocks were dyed orange. Detective Montgomery stated that Mr. Dunnigan did not mention the shooter's having orange-tipped hair. Detective Montgomery said that Mr. Dunnigan told him the suspect was wearing a black or grey shirt and that he did not specify the sleeve length. Detective Montgomery stated that he asked Mr. Dunnigan if he knew anyone named ReeRee, that it was possible he asked Mr. Dunnigan before showing Mr. Dunnigan the photograph lineup, and that Mr. Dunnigan denied knowing anyone named ReeRee. Detective Montgomery stated that he asked Mr. Dunnigan to wait nearby until the officers finished processing the crime scene, that neighbors waited outside the scene, and that Detective Montgomery did not know where Mr. Dunnigan went after he left the police cruiser.

Detective Montgomery testified that Mr. Dunnigan viewed the photograph lineup at 4:00 a.m. Detective Montgomery said that between his speaking to Mr. Dunnigan and Mr. Dunnigan's viewing the photograph lineup, Detective Montgomery received information that ReeRee might have been the Defendant and that the Defendant's photograph was the basis for the lineup. He stated that Ms. Harris was in surgery and that she did not supply this information. Detective Montgomery stated that the Defendant's photograph was displayed first in the lineup, that he had the ability to change the order of the photographs, and that he did not change the order of the photographs generated by the computer software. He said that he did not take written notes or make a recording of Mr. Dunnigan's viewing the lineup. Detective Montgomery provided testimony similar to his suppression hearing testimony regarding the procedures used during the identification but noted he left the room while Mr. Dunnigan viewed the photographs. Detective Montgomery acknowledged after reviewing his preliminary hearing testimony that he did not testify about leaving the room after providing Mr. Dunnigan the photographs. Detective Montgomery stated that it was possible

he made comments to Mr. Dunnigan after Mr. Dunnigan identified the Defendant's photograph but that he did not remember.

Detective Montgomery provided testimony similar to his suppression hearing testimony regarding his training relative to creating a photograph lineup. He stated that he had not read the Chattanooga Police Department's policy recently. He agreed that specific preliminary instructions should be given to a witness in order to avoid contamination of the identification process.

Detective Montgomery testified relative to Ms. Harris's identifying the Defendant from the photograph lineup at the hospital that he recorded part of the interview, that a portion of the conversation occurred before he began recording, and that he did not take written notes about the unrecorded portion of the interview. He agreed that he did not give Ms. Harris any instructions before showing her the photograph lineup. He did not know whether Ms. Harris was sedated during the interview and said he understood her, although she was unable to lift her head and "was trailing off" in her speech. He stated that he did not give her instructions because she was in the hospital and that he "was trying to be as little intrusive as possible while she was recovering." He said, though, that the instructions were very important and acknowledged that a witness could be influenced by an officer's statements or "slightest cue." He stated that Ms. Harris did not describe the shooter in the interview and that he created the photograph lineup based upon the description Mr. Dunnigan provided. Detective Montgomery said that he based the lineup on the Defendant's name and acknowledged that the police had already arrested the Defendant when he interviewed Ms. Harris.

Detective Montgomery testified that the Defendant's photograph was last in the lineup viewed by Ms. Harris. He said he testified mistakenly at the preliminary hearing that he used the same photograph order for both lineups. He said that Ms. Harris hesitated when she saw the photograph before the Defendant's photograph and said the man "kind of looks like him." Detective Montgomery told her that he had one more photograph for her to view, and Ms. Harris selected the Defendant's photograph on the following page. Detective Montgomery stated that he would have viewed all the photographs with Ms. Harris regardless of her reaction to a specific photograph.

Detective Montgomery testified that Ms. Harris asked for the Defendant's name, that he told her the Defendant's name was Jerrico, and that he did not think the name was familiar to her. He said that Ms. Harris asked the Defendant's "street name" and that he told her it was ReeRee. Detective Montgomery stated that before Ms. Harris viewed the photograph lineup, he and Ms. Harris discussed ReeRee as being the perpetrator. Detective Montgomery

said that Investigator Pugliese asked Ms. Harris about her level of certainty in her identification before discussing the Defendant's name. Detective Montgomery stated that he told Ms. Harris an arrest warrant had been issued for the Defendant and that the police would "get this guy." When asked whether these statements confirmed for Ms. Harris that she had chosen the correct photograph, Detective Montgomery said that he thought Ms. Harris deserved to know what was happening and that he was unsure if Ms. Harris would live.

Detective Montgomery did not remember if he interviewed Jimmy Williams, Mr. Williams's brother, but acknowledged that notes from the interview were included in a supplemental police report he prepared. He remembered someone mentioning that Mr. Williams's brother had been robbed two weeks before the shooting and that the robbery had been planned by Dustin Walker. Detective Montgomery said that the police attempted to find Mr. Walker, although the attempt was not documented in any of the supplemental reports. He stated that he eventually met and interviewed Mr. Walker and that he thought Mr. Walker had dreadlocks. Various photographs of Mr. Walker taken by the police and four photograph lineups were received as exhibits. Detective Montgomery said the photograph lineups were used to eliminate four possible suspects, including the man believed to be the Defendant's brother and Mr. McCray.

When asked whether Mr. Walker matched the description Mr. Dunnigan provided the police, Detective Montgomery responded that the Defendant had a darker skin tone than Mr. Walker. Detective Montgomery said that the police investigated Mr. Walker but that a photograph lineup including Mr. Walker's photograph was never presented to Mr. Dunnigan or Ms. Harris. Detective Montgomery said that some of the lineups were based upon the description of the codefendant, who was described as having a close haircut and light skin.

Relative to the photograph lineup that included a photograph of Mr. McCray, Detective Montgomery testified that Mr. McCray was a suspect who resembled the Defendant and that the lineup was intended to ensure Mr. Dunnigan did not mistake Mr. McCray for the Defendant. Detective Montgomery said that he showed lineups to Mr. Dunnigan containing suspects whose appearances were similar to the Defendant. Detective Montgomery stated that he showed the additional lineups to Mr. Dunnigan after the Defendant was identified. He said that it was possible the lineups were administered after the Defendant's photograph had been released to the news media because he did not know when the release occurred.

Detective Montgomery testified that Mr. Williams's cell phone was collected as evidence, that photographs were contained on the phone, and that the photographs included Mr. Williams's posing with money. He said that generally, when a person made it public

knowledge the person had a lot of money, the person increased the likelihood of being targeted. Detective Montgomery acknowledged that crack cocaine was recovered at the scene, that drug dealers were targeted in the community, and that someone had attempted to kill Mr. Williams one week before the shooting.

Detective Montgomery testified that the police received information that Mr. McCray and the Defendant were together in a white vehicle at Superior Creek Lodge and that the police found Mr. McCray at the motel with his girlfriend. Detective Montgomery said that he interviewed Mr. McCray on August 2, 2011, that Mr. McCray waived his *Miranda* rights, and that Mr. McCray denied having left the motel that week.

Detective Montgomery testified that he searched Mr. McCray's motel room, that a key was found, and that Mr. McCray said the key operated a pickup truck. Detective Montgomery said that he obtained a video surveillance recording of people who entered Mr. McCray's room. Detective Montgomery identified photographs taken from the surveillance recording on July 27 at 9:46 a.m., which depicted a white Chevy Lumina with a female passenger. Photographs from the 5:26 p.m. recording showed a white Lumina, and Detective Montgomery believed the driver was an African-American woman. Detective Montgomery remembered video surveillance from July 28 showed Mr. McCray arriving at the motel in a vehicle, although the detective could not recall the make and model. Detective Montgomery agreed the recording reflected Mr. McCray lied about Mr. McCray's not leaving the motel. Detective Montgomery said that the key found in Mr. McCray's room operated a white Chevy Lumina, not a pickup truck.

On redirect examination, Detective Montgomery testified that the audio recording of his interview with Ms. Harris corroborated his testimony relative to the order of photographs in the lineup. Detective Montgomery stated nobody in the street-level crime and prevention unit told that him that Mr. Walker also had the nickname ReeRee, that Ms. Harris identified Mr. Walker, or that Mr. Williams said, "Dustin Jerome Walker, why are you doing this to me?"

Relative to the photograph lineups Detective Montgomery showed Mr. Dunnigan after identifying the Defendant, Detective Montgomery testified that he knew a second person had entered the home, that the person had not been identified at the time the lineups were shown to Mr. Dunnigan, that no identifications were made as a result of the lineups, and that Detective Montgomery began to investigate the Defendant's known associates regardless of their physical descriptions. Detective Montgomery stated that the associates included a man thought to be the Defendant's brother, Prentice Barnett, who was identified by multiple "concerned citizens," and Mr. McCray. Detective Montgomery said that he began

-20-

investigating Mr. McCray because he received information indicating Mr. McCray and the Defendant had been seen together. Detective Montgomery stated that multiple concerned citizens called the police in connection with this case, that many names were provided to the police, and that he investigated every person to be thorough.

On recross-examination, Detective Montgomery testified that he learned a person named "RaaRaa" existed and that he did not know whether more than one person had the nickname ReeRee. Detective Montgomery acknowledged that Mr. Barnett's name did not appear in the supplemental police reports and that the supplements referenced Mr. Walker's having potentially planned to rob Mr. Williams the week before the shooting. Detective Montgomery believed that Mr. Williams's brother provided the information about Mr. Walker. Detective Montgomery said that he never presented a lineup containing Mr. Walker's photograph to Mr. Dunnigan. Relative to the man whose surname was also Hawthorne, Detective Montgomery stated that he included the man's photograph in a lineup because he had light skin and fit the description of the codefendant. Detective Montgomery acknowledged relative to the lineup that included Mr. McCray's photograph that two of the photographs depicted men who did not have any similar physical characteristics to Mr. McCray.

On further redirect examination, Detective Montgomery testified that he did not tell Mr. Dunnigan he was going to "get this guy" in order to taint Mr. Dunnigan's memory of events or to suggest a perpetrator. Detective Montgomery said he made the statement to make Mr. Dunnigan feel comfortable. Detective Montgomery denied suggesting a perpetrator to Ms. Harris and acknowledged he could have used different procedures.

Laquela Bailey testified that the Defendant was the father of her son and that the Defendant's nickname was ReeRee. She said that the police interviewed her twice, that the first interview was on July 27, and that the second interview occurred after she was taken into custody at the motel room. She stated that she did not know Mr. Dunnigan, C.H., Ms. Harris, or Mr. Williams. She said that in July 2011, she had several cell phone numbers, that she changed her number frequently, and that she did not remember her previous numbers. She stated she and the Defendant shared a cell phone and acknowledged her police statement reflected that her phone number was different from the Defendant's number. She denied that the Defendant used the number she identified in her police statement as his. She said that she probably changed her number the day after she spoke to the police and that she did not remember it. She acknowledged her police statement reflected that the Defendant had changed his number and said she, not the Defendant, probably changed the number. She acknowledged a text message signed by the Defendant that was sent to her phone from the number she identified in her police statement as the Defendant's number. She said that she

never gave the police this number when they asked for his number. She acknowledged her July 30 police statement reflected the Defendant had contacted her from a blocked telephone number on July 29. When asked how the Defendant obtained her new number, Ms. Bailey stated that he could have obtained it from mutual friends.

Ms. Bailey testified that she did not know whether she met the Defendant at a motel on July 29. She said that although the police told her they wanted to speak with the Defendant about a shooting, she was not told that a murder occurred. Ms. Bailey stated that when she went to the police station, she was under the impression the Defendant had been killed, although she denied Detective Montgomery told her this. She said that the officers stated the Defendant had been at a murder scene, that she began to cry, and that she said she did not think the Defendant committed a murder. Ms. Bailey stated that although she did not remember when she met the Defendant at the motel, she spent the night with him and other people. She said that the room was registered to Kimberly Roach, that she told the police she was staying at the motel because her air conditioner was broken, and that Ms. Roach was able to arrange a lower rate because she knew the owners. Ms. Bailey stated that she paid for the room and that she intended to stay until she could afford to repair her air conditioner.

Ms. Bailey testified that she drove a black Nissan and identified photographs of her car. She said that she, her children, and the Defendant had been staying with her mother and that the bags inside her car probably contained some of the Defendant's clothes. She denied she and the Defendant were planning to leave town. Ms. Bailey said that she told the Defendant the police were looking for him in connection with a shooting, that the Defendant contacted his aunt, that the Defendant spoke to a lawyer, and that the Defendant planned to turn himself in to the police. Ms. Bailey stated that the Defendant "brushed it off" and did not ask questions about the circumstances of the shooting. Ms. Bailey denied knowing about the shooting. She identified the cell phone taken from the motel room when she was arrested. She was unsure whether she changed her phone number on July 28.

On cross-examination, Ms. Bailey testified that she was confused about which phone numbers she had at the time of her arrest and that she and the Defendant periodically shared the same number. She said that her first police interview was informal and that she was not read her rights. She stated that the police told her a shooting occurred, that they wanted to talk to the Defendant, and that they were afraid "someone out of the street might be looking to get him." Ms. Bailey said that she left the interview thinking the police wanted to protect the Defendant. She stated that she told the police she had spoken to the Defendant on the phone the previous night around 11:30 and that she did not tell the police she had seen the Defendant earlier in the day before the police interview.

Ms. Bailey testified that she had been staying with her mother, that the Defendant visited her at her mother's home, and that he sometimes stayed overnight. Ms. Bailey said that on the night of the shooting, the Defendant had been at her mother's home for a few hours and that she and the Defendant argued. She said that the Defendant sat outside the home, sent text messages, and called someone to pick him up and that the Defendant left late in the evening. She said that the Defendant called her cell phone a couple of times and that they talked. Ms. Bailey stated that the Defendant did not have a car. Ms. Bailey said that the next day, she and the Defendant continued arguing but reconciled while talking by telephone. Ms. Bailey stated that she relocated to the motel because her mother was expecting guests.

Ms. Bailey testified that initially, she wanted to stay at Ms. Roach's home but ultimately decided to stay at the motel. Ms. Bailey said that the Defendant did not plan to stay overnight at Ms. Roach's home and that Ms. Bailey did not remember if the Defendant was with her when she arranged to stay at the motel. Ms. Bailey denied renting the motel room to help the Defendant hide from the police and said she felt shaken after meeting with the police. She said that her conversation with the Defendant about the police was brief because her children were present and that she later explained this to the police. Ms. Bailey stated that she heard the Defendant's photograph appeared on the news but that she did not see the broadcast.

Ms. Bailey testified that the next morning, she had been awake for about an hour when police officers with guns knocked on her motel room door. She said that her children were present, that she was scared, and that she allowed the police to enter the room. Ms. Bailey said that had she and the Defendant intended to leave town, the interstate was close to the motel.

On redirect examination, Ms. Bailey testified that the Defendant was at her mother's home until about 10:30 the night before she first spoke to the police, although she did not remember a specific date. She agreed her police statement reflected that she last spoke to the Defendant by telephone around 11:30 p.m. She acknowledged she falsely told Detective Montgomery she did not see the Defendant on the day of the shooting. Ms. Bailey acknowledged her police statement reflected she and the Defendant argued the day before the shooting and said she could have confused the dates.

Former Hamilton County Medical Examiner Frank King, an expert in forensic pathology, testified that he conducted Mr. Williams's autopsy, that the manner of death was homicide, and that the cause of death was multiple gunshot wounds. He said that Mr. Williams suffered ten bullet wounds and that the nine entry wounds were found on the arm, abdomen, chest, thigh, back, and buttock. Dr. King stated that he recovered five projectiles

during the autopsy. He said that to his best estimation, all of the gunshots were fired at least two feet from Mr. Williams. Dr. King stated that the pattern of gunshot wounds indicated the gun and Mr. Williams were probably moving. Dr. King said that the number of gunshot wounds indicated Mr. Williams was an intentional target.

On cross-examination, Dr. King testified that he was not provided information related to Mr. Williams's clothes and that because of the lack of markings around the bullet wounds, it was more likely the gun was fired from a distance. He said that although he was not a ballistics expert, he recovered two types of bullets.

Myra Mayes testified for the defense that she had known the Defendant since her childhood. She said that on July 27, 2011, at 10:30 p.m., she was cooking when the Defendant called her requesting she pick him up. She said that she had to call a friend, who had borrowed her car, and that she told the Defendant he would have to wait until she finished cooking. She said that she called the Defendant at 11:15 p.m. to let him know she was on her way to pick him up. She stated that she picked up the Defendant at the emergency room side of Memorial Hospital around 11:35 p.m. She said the Defendant wore a white shirt, white shorts, and black and white tennis shoes. She said they returned to her home and ate dinner. She said that the Defendant stayed overnight and that he did not leave until around noon the next day. Ms. Mayes stated that she and the Defendant were "talking" and spending time together but that it was uncommon for the Defendant to call her and request she pick him up.

Ms. Mayes testified that she also used the name Myra Long, that the Defendant's nickname was ReeRee, and that she referred to him as ReeRee and Jerrico. She did not remember the Defendant's owning a car in July 2011. After reviewing a photograph obtained from the surveillance recording at the motel, Ms. Mayes said that she had never seen the Defendant driving a white Chevy Lumina. She stated that she first learned the Defendant had been charged with murder when he called her from jail soon after his arrest and that she was surprised because he had been with her the night of the shooting. Ms. Mayes said that she mentioned to the Defendant their having been together on the night of the shooting but that they did not discuss it further. A recording of the telephone call was played for the jury.[3]

---

[3] The recording is not included in the appellate record.

Ms. Mayes identified the Defendant's and his grandmother's voices in the recording of the jail telephone call and testified that although the recording did not reflect any discussion relative to where the Defendant was at the time of the shooting, Ms. Mayes did not believe the recording was from the Defendant's first telephone call to her from jail. Ms. Mayes said that she knew the police had arrested the wrong person because the Defendant was with her the night of the shooting. She admitted that although she considered this information important, she did not talk to the police or anyone in the district attorney's office. She said that that the police did not contact her and that nobody but defense counsel spoke to her. She said that the prosecutor found her before the trial, that she did not attend the preliminary hearing, although she knew about it, that she did not speak to the Defendant's previous attorney, and that the first time she spoke to defense counsel was one year before the trial. Ms. Mayes stated she told defense counsel the first time they spoke that she was with the Defendant on the night of the shooting. Ms. Mayes said that she visited the Defendant in jail once but conceded it was possible she visited him three times. She stated that she and the Defendant did not discuss his alibi during the visits.

Ms. Mayes denied that the tattoo on the Defendant's neck was of her name. She said that she had a two-year-old tattoo reading "Smurf ReeRee" on her hand, that the Defendant was important to her, and that she and the Defendant had a previous romantic relationship. She stated that on the night of the shooting, the Defendant called her from a telephone number containing the prefix of the number Ms. Bailey identified as the Defendant's number and that the Defendant had his cell phone with him while they were together. When asked why telephone records reflected the Defendant's calling Ms. Mayes multiple times beginning at 12:35 a.m. on July 28 and Ms. Mayes's calling the Defendant at 12:41 a.m. and 2:00 a.m. on July 28, she said that she did not remember those calls. Relative to the record of a call from Ms. Mayes to the Defendant at 11:43 a.m. on July 28, Ms. Mayes stated that she was not certain what time the Defendant left her house that day.

On redirect examination, Ms. Mayes acknowledged that the telephone records reflected calls to her cell phone from the Defendant's cell phone at 11:07 p.m. and 11:33 p.m. on July 27. She was certain the Defendant was with her all night on July 27.

On recross-examination, Ms. Mayes testified that the telephone call at 11:33 p.m. occurred when she picked up the Defendant. Ms. Mayes did not remember the substance of the previous telephone calls, some of which were between five and fourteen seconds.

On further redirect examination, Ms. Mayes testified that some of the calls later that night were also seconds in length. She said that it was possible the calls were accidental because she had a touch screen cell phone but that she did not remember the calls.

-25-

David Ross, an expert in forensic psychology with a specialization in eyewitness identification, testified that the United States Department of Justice (DOJ) published guidelines for collecting identification evidence in October 1999, that the DOJ published a training manual for police academies in 2003, and that states had been slow to adopt the guidelines. He estimated twenty-seven states used some portion of the guidelines. Dr. Ross said that the federal guidelines, in conjunction with guidelines published by the International Association of Chiefs of Police (IACP) in 2010, were the standard by which lineups should be conducted. Dr. Ross noted that the 2010 guidelines were more stringent than federal guidelines. Dr. Ross said that although the two guidelines were not mandatory in Tennessee, he taught them to TBI agents.

Dr. Ross testified that the guidelines were intended to maximize the accuracy of eyewitness identification of suspects, that memory was fragile and could be contaminated easily, and that no method existed to ascertain whether a witness's memory was accurate. He said that contamination of a witness's memory could be inadvertent and could be caused by a small action or remark. He stated that the starting point for a photograph lineup was any description of physical characteristics given to the police, that a lineup should have between six and eight photographs, and that the guidelines advised against placing a suspect's photograph first or last in the sequence, although presenting photographs one at a time was not as problematic.

Relative to the preliminary instructions that a witness should be provided before viewing a photograph lineup, Dr. Ross testified that the witness should be told that the suspect may not be in the lineup and that the investigation would continue if the witness did not identify anyone. He said that in order to avoid subtle verbal or nonverbal cues, the officer administering the lineup should not know which photograph depicted the suspect and should make the witness aware of this information. He stated that a witness should be advised not to discuss a lineup with anyone.

Relative to Ms. Harris's identifying the Defendant in the photograph lineup, Dr. Ross testified that he reviewed the police reports, the preliminary hearing transcript, and the suppression hearing transcript. He also attended the suppression hearing and listened to the audio recording of Ms. Harris's identification. Dr. Ross said that the lineup could have been improved by ensuring the men in the lineup had the same characteristics described by Mr. Dunnigan, including wearing a black shirt and having similar tattoos and facial hair.

Dr. Ross testified that the photograph lineup was not administered in conformity with the guidelines. He said that conducting an interview prior to administering a lineup was problematic because no method existed to ensure the witness was not influenced by the

interview. He stated that Detective Montgomery should have obtained a description of the suspect from Ms. Harris before interviewing her because her description could have been different from Mr. Dunnigan's description. Dr. Ross said that giving preliminary instructions was more important when a witness was medicated and that Ms. Harris was not instructed before her identification. Dr. Ross said that Ms. Harris asked several questions during the lineup and that the detectives answered her, which would have been avoided if the officer administering the lineup had no knowledge of the case. He stated that a question existed as to whether Ms. Harris was given enough time to look at the seventh photograph before being presented with the eighth photograph. Dr. Ross said that the comments Detective Montgomery made after Ms. Harris's identification regarding the arrest warrant could have inflated Ms. Harris's confidence in her identification and changed her memory of the events.

Relative to the photograph lineup viewed by Mr. Dunnigan, Dr. Ross testified that he reviewed the police reports and observed Mr. Dunnigan's testimony at the suppression hearing and the trial. Dr. Ross said he was confused because the lineup procedure had not been documented, Detective Montgomery had not testified until the trial that he had left the room after giving Mr. Dunnigan the photographs, and Mr. Dunnigan testified that he had been told only to try to identify the person, whereas Detective Montgomery testified that he instructed Mr. Dunnigan differently. Dr. Ross stated that an investigator's memory was prone to memory lapses similarly to the general population and that without documentation, he was unsure what occurred.

Dr. Ross testified that the flaws in the administration of both photograph lineups introduced uncertainty as to the reliability of the identification. Dr. Ross said that he was not surprised by Ms. Harris's confidence in her identification because the detectives gave her positive post-identification feedback. He stated that Ms. Harris's and Mr. Dunnigan's in-court identifications had little meaning to him because they had seen the Defendant in court multiple times.

Dr. Ross testified that he would give Ms. Harris's identification a failing grade because "so much information was given during the lineup identification process itself. Confirmation bias on the back end." Dr. Ross could not grade Mr. Dunnigan's identification because of the lack of documentation, but he said that he would give a preliminary instruction to "look at the lineup and identify the person" a failing grade. Dr. Ross stated that he was concerned by the lack of documentation and by Detective Montgomery's not being a blind administrator.

On cross-examination, Dr. Ross testified that his role was not to determine whether the identifications were incorrect. He acknowledged that he did not analyze conditions at the

crime scene and any impact on the witnesses's ability to see a person. Dr. Ross acknowledged that research showed a person who was personally interested in an event recalled it more clearly than a person who was not and that Ms. Harris and Mr. Dunnigan were personally interested in the identity of the shooter. Dr. Ross said that he never interviewed Detective Montgomery. Dr. Ross stated that the guidelines were suggested best practices to achieve the policy of not making any one photograph stand out. Dr. Ross acknowledged that practical considerations could limit an investigator's ability to compose a lineup complying with all of the guidelines and that all the procedures may not be necessary in all cases. He agreed the 2003 training manual stated that instructors were permitted to inform trainees that modifications to the guidelines might be necessary to meet the specific needs of a department. He said, though, that he had success implementing the guidelines.

Dr. Ross testified that the photograph lineup viewed by Mr. Dunnigan correctly included only one suspect, that the photograph of the Defendant reasonably resembled the description Mr. Dunnigan gave to the police, that at least five "filler" photographs of other individuals were included, and that the other individuals were sufficiently distinguishable from the Defendant. Dr. Ross said that although Mr. Dunnigan did not mention tattoos in his description, the photograph of the Defendant showed a small portion of a neck tattoo and that the police had documentation suggesting the Defendant had many tattoos. Dr. Ross stated that as a result, the police should have included a photograph showing the Defendant's tattoos and should have used filler photographs of other individuals with tattoos. Dr. Ross acknowledged, though, that the Defendant's photograph did not stand out in the lineup as a result of a visible neck tattoo.

Dr. Ross testified that Detective Montgomery's moving the Defendant's photograph from first to last in the photograph lineup complied with the spirit of the guidelines. Dr. Ross acknowledged that no previous arrest information was displayed in the lineup photographs and that Detective Montgomery preserved the photographs in the order in which he presented them. Relative to Ms. Harris's pausing on the photograph before the Defendant's photograph, Dr. Ross said that because Detective Montgomery was not a blind administrator, it was unclear whether Detective Montgomery sufficiently waited to present the last photograph. Dr. Ross stated that an administrator could either stop the witness after the witness made an identification or could continue through all the photographs. Dr. Ross said that he did not object to Detective Montgomery's continuing to the eighth photograph, that he did not know if Detective Montgomery was assured Ms. Harris had made a decision about the seventh photograph before moving on, and that in the context of the lack of instructions and other procedural problems, Dr. Ross felt Detective Montgomery's comment about having one more photograph to show Ms. Harris could have been suggestive.

Dr. Ross testified that by leaving the room, Detective Montgomery was unable to give Mr. Dunnigan verbal and non-verbal cues but that the best practice was to have a blind administrator present for the photograph lineup. Dr. Ross agreed that Detective Montgomery documented the results of the lineup but that an audio or video recording was more desirable. Dr. Ross agreed that Detective Montgomery complied with the guidelines when he recorded Ms. Harris's lineup. Dr. Ross acknowledged that a witness being in the hospital was a logistical consideration making the application of the guidelines difficult. He said, however, one of the guidelines stated that an investigator should ensure a witness was physically and emotionally capable of providing an identification. Dr. Ross acknowledged a statement in the 1999 guidelines reading, "[E]ye-witness identification procedures that do not employ the practices recommended in this guide will not necessarily invalidate or detract from the evidence in a particular case." He acknowledged that Ms. Harris's being in the hospital, the severity of her injuries, and time limitations made the situation difficult but said that had Detective Montgomery interviewed Ms. Harris after conducting the lineup, the issue could have been avoided. Dr. Ross acknowledged that his testimony and the witness identifications were only part of the evidence the jury should consider.

On redirect examination, Dr. Ross testified that the 2010 IACP guidelines were more stringent than the DOJ guidelines, particularly on the subject of blind administration. Dr. Ross said that photograph editing programs were used in some agencies to ensure similar appearance of the subjects, including changing the color of and adding tattoos. Dr. Ross stated that he did not know whether Detective Montgomery spoke with Ms. Harris's physician to ensure she was capable of being interviewed. Dr. Ross said that the detectives made accommodations for Ms. Harris's physical limitations, that her limitations did not justify the absence of instructions, and that generally, instructions were designed to reduce stress for the person viewing a photograph lineup. Dr. Ross said that based upon his review, no emergency existed requiring modified procedures for the lineup viewed by Mr. Dunnigan.

Relative to the lineup viewed by Ms. Harris, Dr. Ross testified that the detectives told Ms. Harris to identify the man who shot her, that they answered questions she asked about the total number of photographs and the shooter's street name, that Ms. Harris paused at the seventh photograph and said, "I'm not sure but he kind of looks like him," that Detective Montgomery told Ms. Harris he had one more photograph for her view, and that Ms. Harris identified the eighth photograph as the shooter. Dr. Ross stated that the detectives asked Ms. Harris if she chose photograph number one, not photograph number eight, that a detective told Ms. Harris that the man in photograph number eight was the man who shot her and Mr. Williams, that Ms. Harris asked the man's name, and that the detectives told her the Defendant's first name and nickname. Dr. Ross said that the detectives asked Ms. Harris how confident she was about her identification after they told her the man's nickname was

-29-

ReeRee and that she responded her confidence was nine out of ten. Dr. Ross stated that the detectives explained an arrest warrant had been issued for the Defendant, that Mr. Williams had been killed, and that the detectives were going to "bring this guy in." Dr. Ross said that he was concerned about the cumulative effect of this information in conjunction with the previously mentioned procedural problems. On recross-examination, Dr. Ross stated that he did not know if Detective Montgomery told Mr. Dunnigan he would "get this guy."

Upon this evidence, the jury found the Defendant guilty of first degree premeditated murder of Mr. Williams, first degree felony murder during the perpetration of or attempt to perpetrate a robbery of Mr. Williams, attempt to commit first degree premeditated murder of Ms. Harris, especially aggravated robbery of Mr. Williams, and attempt to commit especially aggravated robbery of Ms. Harris. This appeal followed.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. Although he does not allege the State failed to prove beyond a reasonable doubt the elements of the offenses, he argues the State failed to prove his identity as the perpetrator. In support of his argument, he cites to the alibi evidence from the testimony of Ms. Bailey and Ms. Mayes and to Dr. Ross's testimony relative to an overly suggestive photograph lineup. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). When identity of the perpetrator is solely based upon circumstantial evidence, the facts are required to be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993); *see Reid*, 91 S.W.3d at 277. "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the conscious objective or desire to engage in the conduct or cause the result"). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (2014). "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id.* (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

First degree felony murder, in relevant part, is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (2014). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a) (2014). Relative to felony murder, the State must prove beyond a reasonable doubt that the "intent to commit the underlying felony . . . exist[ed] prior to or concurrent with the commission of the act causing the death of the victim." *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). "Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of

killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances." *Id.*

"Especially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon[] and [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a)(1), (2) (2014). A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" *Id.* § 39-12-101(a)(2).

We conclude that the evidence sufficiently established the Defendant's identity as the perpetrator of the offenses for which he was convicted. In the light most favorable to the State, the record reflects that Mr. Dunnigan saw the Defendant and the codefendant as they approached him on the front porch of the home. Although the porch light was off, Mr. Dunnigan testified that the street lights were on, permitting him to see the Defendant and the codefendant. Likewise, Mr. Dunnigan testified that although the bedroom light was off, the bedroom television and the bathroom light remained on during the incident. Mr. Dunnigan provided a description of the shooter to the police, and based upon his description, the police compiled a photograph lineup from which Mr. Dunnigan identified the Defendant.

The record also reflects that after Ms. Harris entered the home, she saw the Defendant at the front door holding a gun. She said that the Defendant was standing two feet from her when she saw his face. She said that the end table lamp and the overhead ceiling light were on in the living room. Ms. Harris was adamant that she saw the Defendant's face and would never forget it. She also identified the Defendant's photograph from the lineup provided by the police.

Although the Defendant presented evidence that Mr. Dunnigan and Ms. Harris mistakenly identified the Defendant and that the Defendant was with Ms. Mayes at the time of the shooting, the jury's verdict reflects that it credited the testimony of Mr. Dunnigan and Ms. Harris that the Defendant was one of the perpetrators during the incident. The credibility of the witnesses was a question for the jury, and any conflicts in the evidence were resolved by the jury. As a result, we conclude that the evidence is sufficient to support the Defendant's convictions for first degree premeditated and felony murder, especially aggravated robbery, and attempt to commit first degree premeditated murder.

However, the evidence is insufficient to support the Defendant's conviction for attempt to commit especially aggravated robbery. Although Ms. Harris testified at the suppression hearing that one of the men searched her purse but that nothing was taken, this

evidence was not presented to the jury at the trial. She testified relative to the Defendant's taking money from Mr. Williams's pockets, shooting Mr. Williams, and leaving the home. She was not questioned and did not testify relative to the Defendant's or the codefendant's searching her purse or attempting to take her property. The jury heard neither direct nor circumstantial evidence from which it could reasonably infer that the Defendant or the codefendant attempted to take property from Ms. Harris. As a result, we conclude that the evidence is insufficient to support the attempted especially aggravated robbery conviction, and we reverse the judgment, vacate the conviction, and dismiss the charge.

## II.    Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress the pretrial identifications of the Defendant because the photograph lineup was unduly suggestive, tainting the in-court identifications at the trial. The State argues the trial court properly denied the Defendant's motion to suppress. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Supreme Court has recognized that although perils exist in identifying suspects through use of photograph lineups, identification from photographs can be an effective method "from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." *Simmons v. United States*, 390 U.S. 377, 384 (1968). As the *Simmons* court recognized, potential for misidentification increases when a photograph is "in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id*. at 383. The *Simmons* court held that

"convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*. at 384; *see Sloan v. State*, 584 S.W.2d 461, 466 (Tenn. Crim. App. 1978). "[A] photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)).

The relevant guidelines for assessing whether evidence of an identification from a photograph lineup is admissible were announced in *Neil v. Biggers*, 409 U.S. 188 (1972). The *Biggers* two-part analysis requires, first, that the trial court determine whether the identification procedure was unduly suggestive. *Id*. at 198. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998); *see Simmons*, 390 U.S. at 383. If the identification procedure was unduly suggestive, the second question is whether the identification was reliable despite the undue suggestion. *Biggers*, 409 U.S. at 198-99. The *Biggers* majority identified five factors to be considered in making that determination:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199-200. If, upon consideration of the *Biggers* factors, the court determines that the identification procedure was so unduly suggestive that it violated the defendant's due process rights, evidence of the identification must be excluded. *State v. Shanklin*, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

After receiving the proof, the trial court denied the motion to suppress. The court noted that no photograph lineup was perfect but found that the concerns raised by the evidence at the hearing were relevant to the weight, not the admissibility, of the identifications. The court found that the identifications by Mr. Dunnigan and Ms. Harris were not impermissibly suggestive and did not violate the Defendant's due process rights. Because the court determined that the lineup was not unduly suggestive, it did not conduct an analysis of the *Biggers* factors to determine whether the identifications were reliable despite an unduly suggestive lineup. *See Biggers*, 409 U.S. at 198-99.

-34-

We have reviewed the photograph lineup from which Mr. Dunnigan and Ms. Harris identified the Defendant and conclude that the evidence does not preponderate against the trial court's findings. The photographs contained in the lineup depict eight African-American men with hair in dreadlocks. Although the lengths of the subjects' hair vary slightly, each subject has at least shoulder-length hair. Likewise, all the subjects have a similar skin tone and appear to be of the same approximate age. The background used in the photographs is identical, and all of the subjects are wearing white or black shirts. No subject is distinctively attired. Although facial hair was not a feature described by Mr. Dunnigan or Ms. Harris, six of the eight subjects, including the Defendant, have similar facial hair. As a result, the facial hair is not distinct or prominent in such a manner that would unduly draw a viewer's attention to the Defendant's photograph. Furthermore, although tattoos were also not a feature described by Mr. Dunnigan or Ms. Harris and the Defendant has slightly visible neck tattoos in the photograph, the photographs are not high resolution. The tattoos are faint and partially obscured by the Defendant's hair and are not distinct or prominent in such a manner that would unduly draw a viewer's attention to the Defendant's photograph. We note that a second subject may have neck tattoos, although we are unable to make this determination due to the low resolution of the photograph.

Relative to the Defendant's argument that the procedures utilized by Detective Montgomery were inherently suggestive because the detective failed to comply with the guidelines of the DOJ and the IACP, we note that the guidelines are suggestions for preventing an unduly suggestive photograph lineup. The standard applied by our courts is whether the identification was "conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *Cribbs*, 967 S.W.2d at 794; *see Simmons*, 390 U.S. at 383. The detective provided Mr. Dunnigan eight photographs on individual pages and instructed Mr. Dunnigan to examine the subjects' permanent features, including eyes, noses, and mouths and to only make an identification if he saw the person who was involved in the shooting. Detective Montgomery testified at the trial that he left the room while Mr. Dunnigan viewed the photographs. We conclude that this procedure was not conducted in such a manner as to create substantial likelihood of irreparable misidentification.

Relative to Ms. Harris's identification, the record reflects that when Detective Montgomery spoke with her in the hospital's intensive care unit, the detective believed Ms. Harris would succumb to her injuries. Ms. Harris was suffering severe pain and was difficult to understand at times. Although the detective conceded he did not provide Ms. Harris the same instructions he provided Mr. Dunnigan, the same photograph lineup was used except that the Defendant's photograph was moved to the last page. Detective Montgomery held the photographs while Ms. Harris viewed them, and although she thought the subject depicted in

the photograph before the Defendant could have been the person who shot her and Mr. Williams, the detective advised Ms. Harris that one additional photograph remained for her to view. Upon showing Ms. Harris the last photograph, she identified the Defendant without hesitation. Although the Defendant takes issue with the detective's telling Ms. Harris the Defendant's nickname and legal name, the information was requested by Ms. Harris and provided by the detective after she identified the Defendant. We cannot conclude, given the totality of the circumstances, that the procedure utilized created a substantial likelihood of irreparable misidentification.

The trial court properly determined that the lineup was not unduly suggestive and was not subject to suppression. Because the lineup was not unduly suggestive, consideration of the *Biggers* factors is not required. Likewise, Mr. Dunnigan's and Ms. Harris's in-court identifications were proper. The Defendant is not entitled to relief on this basis.

### III.    Evidence of Cell Phone Data

The Defendant contends that the trial court erred by permitting the State to present evidence of data from his, Mr. McCray's, Ms. Bailey's, and Mr. Williams's cell phones and evidence of telephone call records provided by the telephone company, corresponding to each cell phone. He relies upon *Riley v. California*, --- U.S. ---, 134 S. Ct. 2473 (2014), to support his argument that the data was unlawfully obtained without a search warrant in violation of his right against unlawful searches and seizures. The State responds that the data was properly admitted. We agree with the State.

As a preliminary matter, the State correctly notes in its brief that the Defendant did not attempt to suppress the records and data or contemporaneously object when the records were received as exhibits at the trial. The Defendant raised this issue for the first time in his motion for a new trial. *See* Tenn. R. Crim. P. 12(b)(2)(C) (stating that a motion to suppress evidence must be filed before a trial); *see also* Tenn. R. Evid. 103(a)(1) (stating error may not be based upon the admission of evidence unless a timely objection or motion to strike is made at the time the evidence is offered for admission). The Defendant's failure to contemporaneously object at the trial results in waiver of the issue. *Id*.; *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988); *see also* T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). As a result, we are limited to review for plain error.

-36-

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

The Fourth Amendment of the United States Constitution and Article 1, section 7 of the Tennessee Constitution guarantee freedom from unreasonable searches and seizures when an individual has a reasonable expectation of privacy in the place searched or the objects seized. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. A reasonable expectation of privacy is an individual right, and a person must have an interest in the place or items searched in order to have standing to challenge the constitutionality of a search. *State v. Talley*, 307 S.W.3d 723, 730 (Tenn. 2010). Our supreme court has identified several factors for courts to analyze when considering whether a person has standing to challenge a search:

> (1) [whether the defendant owns the property seized]; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether he has the right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether he took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises.

*Id.* at 731 (quoting *State v. Ross*, 49 S.W.3d 833, 841 (Tenn. 2001) (internal citations omitted)).

In *Riley*, the Supreme Court concluded that a warrant is generally required before law enforcement may search a cell phone, "even when a cell phone is seized incident to an arrest." *Riley*, --- U.S. at ---, 134 S. Ct. at 2493. The court further stated that generally, the "search incident to an arrest exception [to the warrant requirement] does not apply to cell phones." *Id.* at 2494. The Defendant's reliance on *Riley* is misplaced. In *Riley*, the relevant cell phone belonged to the Defendant, was seized at the time of his arrest, and was searched without a warrant. *Id.* at 2480. Likewise, incriminating evidence from the phone was presented at the defendant's trial. *Id.*

In the present case, the record reflects that cell phone data and call log information corresponding to the telephone number identified as the Defendant's number were not introduced at the trial. We note the Defendant does not contend that an unlawful search of his cell phone occurred, that the unlawful search led to the discovery of additional evidence, that the additional evidence was introduced at the trial, and that the additional evidence would not have been discovered absent an unlawful search. *See Wong Sun v. U.S.*, 371 U.S. 471, 488-89 (1963) (adopting the "fruit of the poisonous tree" doctrine); *State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005).

Relative to the telephone records and data furnished by the cellular provider pursuant to subpoenas, our court has previously concluded that no reasonable expectation of privacy exists in telephone records maintained by a third party. *State v. Hodgkinson*, 778 S.W.2d 54, 62 (Tenn. Crim. App. 1989). Relative to Mr. McCray's and Mr. Williams's cell phones, the Defendant did not have standing to challenge the searches because he had no reasonable expectation of privacy in another person's cell phone data and records. Although Ms. Bailey testified that she and the Defendant shared some of her numerous cell phones, she identified the relevant telephone number as corresponding to her cell phone, not the Defendant's cell phone. Therefore, the Defendant also had no standing to challenge the search of Ms. Bailey's cell phone and had no reasonable expectation of privacy in the corresponding data.

Because the Defendant did not have standing to challenge the constitutionality of the searches that produced the cell phone records and data presented at the trial, he has failed to establish that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, and that consideration of the issue is necessary to do substantial justice. The Defendant is not entitled to relief on this basis.

## IV. Dying Declaration

The Defendant contends that the trial court erred by permitting evidence pursuant to Tennessee Rule of Evidence 804(b)(2), the dying declaration exception to the rule against

hearsay. The Defendant states the issue in the context of the trial court's erring by "permitting the State, over objection of the Defendant to elicit testimony from Officer Frisbee without proper foundation that . . . [Ms.] Harris advised Officer Frisbee that . . . [Mr.] Williams . . . made a dying declaration that ReeRee did it." The Defendant's argument, however, also focuses on Ms. Harris's testimony regarding Mr. Williams's identifying ReeRee as the shooter during the incident. The State argues that the Defendant has prepared an inadequate record relative to this issue and that the issue is waived. Alternatively, the State argues that the testimony of Officer Frisbee and Ms. Harris was presented and admissible as exited utterances.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Id.* at 403.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Id.* at 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. Tennessee Rule of Evidence 803(3) provides that an excited utterance, which is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," is not excluded by the hearsay rule. Furthermore, "[i]n a prosecution for homicide . . . , a statement made by a declarant while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death" is not excluded by the hearsay rule. *Id*. at 804(b)(2).

The record reflects that the State filed a pretrial motion to determine the admissibility of evidence related to Mr. Williams's identifying the shooter as ReeRee. The motion, however, is not included in the record, and it is unclear whether the motion sought a ruling on the admissibility of Ms. Harris's telling Officer Frisbee at the scene that ReeRee was the shooter. The record contains the Defendant's response to the motion and the June 17, 2013 trial court minutes, indicating that the court's ruling on the State's motion was reserved for the trial. A transcript of the motion hearing is likewise absent from the appellate record. We note that the Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). This includes the obligation to have the relevant pretrial motion and respective transcript of the evidence or proceedings prepared.

-39-

In any event, Officer Frisbee testified that when he arrived at the crime scene, Ms. Harris was losing blood and was suffering extreme pain. He stated that Ms. Harris repeatedly asked him to help her and that he advised paramedics were en route. He attempted to console her and assure her that she would survive, although he thought she would succumb to her injuries. Officer Frisbee said that he asked Ms. Harris who shot her and that she responded, "ReeRee did it." The Defendant objected without stating the basis for the objection, and the prosecutor argued Ms. Harris's statement was an exited utterance. The trial court overruled the objection.

As a result, the record does not reflect that Officer Harris testified that Ms. Harris stated she heard Mr. Williams identify the shooter as ReeRee. The evidence shows, rather, that Ms. Harris identified the shooter. The trial court properly concluded Ms. Harris's statement to Officer Frisbee was an excited utterance. *See State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010). The statement related to the shooting, a starling event, and was made while Ms. Harris lay on the porch of her home awaiting medical treatment after being shot three times. She was suffering pain, was losing blood, had vomited, and begged Officer Frisbee to help her. The statement was made while Ms. Harris was under the stress caused by the shooting and her medical condition. The Defendant is not entitled to relief.

Ms. Harris testified at the trial that the Defendant pulled out money from Mr. Williams's pockets and "just started shooting." She said that although she could not determine where Mr. Williams was being shot, she saw that the Defendant's gun was pointed toward Mr. Williams's chest. She said that during the shooting, she heard Mr. Williams say, "ReeRee Jerrico, man, why you doing this." The Defendant did not object to Ms. Harris's testimony, and the record does not reflect any discussion about the admissibility of the testimony. We note that the court minutes reflect the trial court's ruling was reserved for the trial and that no ruling had been made at the time of the testimony. The issue was not raised until the hearing on the Defendant's motion for a new trial. At the hearing, the trial court stated that a pretrial hearing was held, at which the issue was "thoroughly hashed out," and it determined that the statement was properly admitted as a dying declaration.

The Defendant was aware that the trial court reserved its determination on the State's motion relative to the admissibility of the testimony until the appropriate time at the trial and failed to object contemporaneously during the trial. *See* Tenn. R. Evid. 103(a)(1). The Defendant's failure to contemporaneously object at the trial results in waiver of the issue. *Id.*; *see Killebrew*, 760 S.W.2d at 235; *see also* T.R.A.P. 36(a). The Defendant is not entitled to relief on this basis.

## V.        Lesser Included Offenses

The Defendant contends that the trial court erred by failing to instruct the jury on the lesser included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide relative to the first degree premeditated and felony murder charges.  He argues that although the trial court instructed the jury on second degree murder, a rational juror could have concluded that the Defendant was guilty of any of the additional lesser included offenses.  The State responds that the Defendant is not entitled to relief because he failed to prepare an adequate record.

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)).  As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial."  *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975).

When a party fails to make a written request for a lesser included offense instruction, a trial court may still instruct a jury on the offense. *Bryant v. State*, 460 S.W.3d 513, 523 (Tenn. 2015). A party, however, is "not entitled to such an instruction." *Id.*; s*ee State v. Fayne*, 451 S.W.3d 362, 370-71 (Tenn. 2014).  A defendant's failure to request an instruction for a lesser included offense results is waiver of the lesser included instruction.  T.C.A. § 40-18-110(c).  Furthermore, "[a]bsent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal."  *Id.*

The record does not contain a written request from the Defendant for an instruction on lesser included offenses or the trial court's final instructions to the jury.  The trial transcript does not reflect any discussion between the parties regarding the trial court's final instructions to the jury generally, lesser included offenses specifically, or any requests by the parties.  The Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal.  *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *see* T.R.A.P. 24(b).  "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987).  Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn.

Crim. App. 1993). The issue is waived because the Defendant has failed to prepare an adequate record.

Furthermore, we conclude plain error does not exist. *See Smith*, 24 S.W.3d at 282; *Adkisson*, 899 S.W.2d at 641-42. The Defendant has not established what transpired in the trial court, that a violation of a clear and unequivocal rule of law occurred, or that a substantial right was adversely affected. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's convictions for first degree premeditated and felony murder, especially aggravated robbery, and attempted first degree murder. In light of insufficient evidence, we reverse the attempt to commit especially aggravated robbery judgment, vacate the conviction, and dismiss the charge.

_____
ROBERT H. MONTGOMERY, JR., JUDGE